FREIBERG MAHOGANY CO. v. BATESVILLE LUMBER & VENEER CO.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1922.)

No. 3678.

Sales ☞388—Instructions approved in action by seller for breach of contract.

Instructions in an action by the seller of mahogany veneers, to be manufactured, for breach of contract by refusal of the buyer to accept the veneers, *held* to present correctly the issues made by the pleadings and to state correctly the measure of damages in conformity with Uniform Sales Act (Gen. Code Ohio, §§ 8443[3], 8444[3]).

In Error to the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Action at law by the Batesville Lumber & Veneer Company against the Freiberg Mahogany Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Murray Seasongood, of Cincinnati, Ohio, for plaintiff in error.

Benton S. Oppenheimer, of Cincinnati, Ohio (Harmon, Colston, Goldsmith & Hoadly and George Hoadly, all of Cincinnati, Ohio, on the brief), for defendant in error.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. This proceeding in error is brought to reverse the judgment of the District Court in an action brought by the Batesville Lumber & Veneer Company against the Freiberg Mahogany Company to recover the contract purchase price of mahogany veneers cut by the plaintiff from logs in its yards, selected by the Freiberg Company. These veneers were rejected by the Freiberg Company before shipment was made. It assigned as its reason for such rejection "bad workmanship either in 'cutting or drying." Later the Batesville Company made shipment of part or all of these veneers, which shipment was refused, and the veneers were returned to the Batesville Company and held by it for the account of the Freiberg Company. A verdict for the full amount of the purchase price was returned against the defendant, on which verdict judgment was entered for the plaintiff in the District Court.

It appears from the evidence that, shortly prior to the execution of the contract between the parties, Herman S. Lax, an employé of the Freiberg Company, visited the factory of the Batesville Company at Lawrenceburg, Ind., and selected from the stock on hand 11 mahogany logs, 5 in one parcel and 6 in another, and had these logs cut into longitudinal sections, known in the trade as "flitches." A few days

---

later, two of the managing officers of the Freiberg Company with Mr. Lax and John Brockman, another of its employés, went to Lawrenceburg, Ind., and examined these flitches. Upon their return to Cincinnati the Freiberg Company wrote to the Batesville Company on the 16th day of September, 1920, the following letter:

"This is to confirm order placed by our Mr. Lax with you yesterday for all the veneer that you will produce out of the eleven (11) logs originally shown Mr. Lax, and which he has flitched for you, consisting of one parcel of five (5) logs and one parcel of six (6) logs, these flitches lying in four different places in your mill, for which we are to pay you $38 per M ft. cut 1/28th, f. o. b. Cincinnati, less 2 per cent. for cash on arrival, but if we are to cut any 1/24th in the lot, we are to pay you $43 for such flitches as we cut 1/24th.

"You are to give us good workmanship in cutting in every particular, and this order is placed with that understanding, and also the veneer is to be measured when dry, before shipment is made, and it is to be manufactured under the supervision of our Mr. Brockman. Our Mr. Lax will be down with Mr. Brockman to show him just what we are to receive, so that there will be no misunderstanding.

"Please confirm the above, as we do not want to leave any further contracts subject to any verbal agreements."

In reply to this letter the Batesville Company, on the 17th day of September, 1920, wrote as follows:

"We have yours of 16th, confirming the purchase by Mr. Lax of the 11 mahogany logs, and the same is in order."

These two letters constitute the contract in suit. There is also evidence tending to prove that on the following Monday morning (September 20, 1920) Mr. Brockman went to Lawrenceburg, Ind., to the factory of the Batesville Company. Before he reached there the flitches had been put in the vat and steamed and made ready for cutting. The work of cutting, drying, and measuring these veneers occupied a little more than a week. From the veneers cut from these flitches Brockman selected three sets of samples, each set composed of three pieces of veneer from each of three separate flitches, and forwarded the same to the Freiberg Company at Cincinnati. On Saturday of that week (September 25, 1920) Brockman returned to Cincinnati and had a consultation with the officers of the Freiberg Company. On the following Monday (September 27, 1920) he went back to Lawrenceburg, Ind., and informed the Batesville Company that he had told the officers of the Freiberg Company that "the cutting was bad and the drying was rotten." At that time the veneers were all cut, and the drying process was finished by 2 o'clock on the afternoon of the next day. Brockman completed the measuring on Tuesday, and the balance of samples were sent on to the Freiberg Company at Cincinnati. On Monday, September 27, 1920, the Freiberg Company wrote the Batesville Company in part as follows:

"Our Mr. Brockman returned home last Saturday and reported to us that the cutting and drying of the 11 logs was not proper, and that the majority of the stock he could not accept as being merchantable stock.

"The samples did not arrive until to-day, but we sent him back this morning to go over the balance of the stocks.

"We carefully went over the samples which were sent in to us, and were amazed at the manner in which many of the flitches were 'butchered' and the way they were dried.

"Under no conditions could we accept the stocks that are manufactured in this manner, as there are very few flitches that are merchantable; the balance being unfit, either on account of poor cutting or poor drying."

It is insisted upon the part of the plaintiff in error that the trial court erred in its instructions to the jury in reference to the authority of Brockman to supervise the manufacture of these veneers, that the evidence showed that Brockman had repeatedly supervised work done by the plaintiff for the defendant, and that his authority in all such cases of supervision, including the present case, was very limited, and that the court in its construction of this provision of the contract overlooked this evidence, and also overlooked the provisions of section 8451 of the General Code of Ohio, which section is a part of the Uniform Sales Act, and provides that:

"When any right, duty, or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement, or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

The determination of this question involves a consideration of the terms of the contract and the pleadings. The letter of the Freiberg Company dated September 16, 1920, which contains the terms and conditions of this contract, specifically required the Batesville Company to confirm in writing the proposition therein made, "as we do not want to leave any further contracts subject to any verbal agreements."

There is nothing ambiguous or uncertain in the language of this letter, nor is there any evidence introduced in this case to show that the word "supervision" had acquired a technical meaning in the trade generally. What may have been done by Mr. Brockman by way of supervising the manufacture of other veneers under verbal arrangements, more or less uncertain in their character, could hardly be permitted to explain the meaning of the word "supervision" in this contract, especially in view of the express statement that the Freiberg Company did not want to leave any further contracts subject to any verbal agreements. If there were any doubt as to what the Freiberg Company understood by the word "supervision" in this contract, that doubt would be removed by the letter written by the Freiberg Company under date of September 27, 1920, in which this language is used:

"Our Mr. Brockman returned home last Saturday and reported to us that the cutting and drying of the 11 logs were not proper, and that the majority of the stock he could not accept as being merchantable stock."

That the Batesville Company had like understanding of this contract is evidenced by the fact that it averred in its petition that it manufactured these veneers "under the supervision and in accordance with the direction of said Brockman and to his entire satisfaction, and that all directions and suggestions of said Brockman with respect to the manufacture thereof were promptly complied with."

The defendant in its answer did not challenge the authority of Brockman to supervise the manufacture of these veneers or plead any limitation as to his authority, but, on the contrary, specifically denied that the plaintiff had manufactured the veneers in accordance with the

directions of Brockman, and denied that the plaintiff manufactured the veneer to the entire satisfaction of said Brockman, and denied that all directions and suggestions of Brockman with respect to the manufacture thereof were promptly complied with. Therefore the issue joined by the pleadings did not involve the question of the extent of Brockman's authority, but, on the contrary, involved the question whether the veneers had been manufactured in accordance with the directions of Brockman and to his entire satisfaction.

The court, however, did not charge the jury that, even if the veneers were manufactured under the supervision of Brockman and to his entire satisfaction, the defendant would be bound thereby, but, after defining the meaning of supervision, in plain, clear, and unambiguous language instructed the jury that Brockman's failure to protest might be considered by it as tending to show "that he, as supervisor, was then satisfied with the same," and also further charged that "if the workmanship was not good, and such poor workmanship was not the result of improper orders given or methods adopted by Brockman, then and under these circumstances the plaintiff did not fulfill its contract to give good workmanship, and the defendant's officers were entitled to reject the veneers, and under such circumstances the plaintiff could not recover." Not only does it appear from this paragraph of the charge that the court did not submit to the jury, as the controlling question in this case, whether the goods had been manufactured under the supervision of Brockman and to his satisfaction, as now contended by plaintiff in error, but, on the contrary, as appears from the entire charge, the court, by the first interrogatory, did submit to the jury the question whether the veneers manufactured by the plaintiff failed to comply with the contract as to good workmanship, not only in the cutting, as specifically provided by the contract itself, but also in the drying of the same. The answer of the jury to this interrogatory, under these instructions by the court, is sustained by substantial evidence. This court has no authority to determine the question of the weight of the evidence.

It is further insisted that the court erred in its charge to the jury in respect to the measure of damages. The charge of the court upon this subject conforms substantially, if not identically, to the language of the Uniform Sales Act, section 8443 (3) and section 8444 (3), relied upon by counsel for plaintiff in error in support of this assignment of error. Section 8443 (3), G. C. Ohio, provides in substance that, if the property in the goods has not passed and they cannot readily be resold for a reasonable price, the seller may offer to deliver and, if the buyer refuses to receive them, may notify the buyer that the goods are thereafter held by the seller as bailee for the buyer, and maintain an action for the price. Section 8444 (3), G. C. Ohio, provides in substance that, when there is an available market for the goods in question, the measure of damage is, in the absence of special circumstances showing proximate damage of a greater amount, the difference between the contract price and the market or current price at the time or times when the goods ought to have been accepted, or, if no time is fixed for acceptance, then at the time of the refusal to accept. These

sections are general, and apply to all classes of property that may be the subject of sale.

The term "available market" in section 8444 (3), G. C., must be construed in connection with the provision as to "reasonable price" found in section 8443 (3), G. C. There is some conflict in this evidence as to whether there was or was not an available market for these goods in or near Cincinnati, Ohio, on the 27th of September, 1920. There is evidence that these veneers might possibly have been sold at from $3 to $10 per 1,000 feet. While the purchase price agreed upon in the contract does not necessarily determine the true value of the property, yet, in the absence of proof showing an extraordinary condition of the market, it is substantial evidence of value, where the subject-matter of the sale is an ordinary article of commerce, having no sentimental, artistic, or historic value. Therefore, in view of the fact that the agreed purchase price was from $38 to $43 per 1,000 feet, it was a question of fact for the determination of the jury whether $8 to $10 per 1,000 feet was a reasonable price. That question was submitted directly to the jury by the following interrogatory:

"Could the goods have been readily resold at a reasonable price on or about September 27, 1920?"

The jury answered this interrogatory in the negative. It is insisted, however, that the charge of the court upon this subject was confusing to the jury, because the court, by way of illustration as to the amount that plaintiff could recover in case the goods could have been resold for a reasonable price, stated that, if the jury were to find they could have been resold at $8, then the difference between $8 and $38, the contract price, would be the measure of the amount of plaintiff's recovery. It is insisted that the court by this illustration told the jury, in effect, that $8 would be a reasonable price. This charge is not subject to such construction. If it were, then it would be error to the prejudice of the plaintiff, and not to the prejudice of the defendant. Neither the trial court nor this court had or has the right to say that a price of $8 to $10 per 1,000 feet for these veneers would, as a matter of law, be a reasonable price, that would, under the provision of Uniform Sales Act, prevent the plaintiff from recovering the full purchase price.

It is also insisted that the evidence discloses that labor and expense of a material amount were necessary on the part of the seller to enable it to fulfill its obligations at the time the buyer rejected the veneers, and that therefore, under the provisions of section 8444 (4), G. C., the seller could not recover greater damages than it would have suffered if it did nothing towards carrying out the contract after the rejection of the goods by the buyer. It is insisted that Brockman verbally notified the plaintiffs, on Monday after his return from Cincinnati, that the goods were rejected; but there is no evidence of such verbal rejection. On the contrary, the record discloses that counsel for defendant offered to prove by Brockman that he told the Batesville Company that he had absolutely no authority to accept or reject the veneers. The court sustained an objection to this evidence, and it was not admitted. He did testify, however, that the cutting was com-

pleted when he reached there Monday, September 27, 1920, and that the drying process was completed on Tuesday, the 28th of September, 1920, at about 2 o'clock in the afternoon. That was the same day that the letter of rejection from the Freiberg Company reached the Batesville Company. This letter also contained the further statement:

"We sent him back this morning to go over the balance of the stocks."

Brockman, of course, could not go over the "balance of the stocks" until the manufacturing processes were completed. It would therefore appear, from the uncontradicted testimony of this witness, that the process of manufacturing these veneers was substantially completed before the veneers were rejected either verbally or in writing, and that the seller did not expend any material amount after such rejection for the purpose of enabling it to fulfill its obligation under the contract. It is wholly unimportant to the disposition of this case to determine whether it was or was not the duty of the plaintiff to ship these veneers to Cincinnati and there tender delivery, for the reason that the court required the plaintiff to pay the freight charges upon this shipment.

There are some other assignments of error in reference to the admission and rejection of evidence, but it is unnecessary to consider these in detail. It is sufficient to say that this court has reached the conclusion that no error intervened in the trial of this cause to the prejudice of the plaintiff in error, and the judgment of the District Court is affirmed.